# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**ANDREW J. GLEASON,**
                    **Plaintiff,**

        **v.**                                                        **Case No. 13-C-1378**

**CAROLYN W. COLVIN,**
**Acting Commissioner, Social Security Administration**
                    **Defendant.**

## DECISION AND ORDER

Plaintiff Andrew Gleason applied for social security disability benefits, claiming that he could no longer work due to a variety of impairments, including back pain, glaucoma, obesity, plantar fasciitis, heart problems, and sleep apnea. The Social Security Administration ("SSA") denied his application initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. Plaintiff sought review from the Appeals Council, and the Council remanded the matter. The ALJ held a second hearing, then issued a decision again denying the claim, and the Council denied plaintiff's request for further review, making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Schomas v. Colvin, 732 F.3d 702, 707 (7th Cir. 2013).

Plaintiff then filed this action for judicial review. Prior to briefing, the parties agreed to a remand pursuant 42 U.S.C. § 405(g), sentence six, because the agency could not locate the recording of the second hearing before the ALJ. The agency subsequently located the hearing tape, the case was re-opened, and the parties filed briefs. On review of the submissions and the administrative record, I now affirm the ALJ's decision.

-1-

# I. FACTS AND BACKGROUND

## A. Overview

Plaintiff served in the military from 1978 to 1990, then worked full-time for the postal service as a letter carrier and mail handler from January 1994 to November 2005. After that, he worked part-time delivering pizzas.[1] (Tr. at 296, 340.)

In July 2006, plaintiff filed an application for benefits with the SSA, claiming a disability onset date of November 23, 2005. That application was denied at the reconsideration level in December 2006, and plaintiff did not seek further review. (Tr. at 201, 282.) Plaintiff filed the instant application in August 2008, alleging a disability onset date of January 1, 2007. (Tr. at 203; see also Tr. at 42-43.) Plaintiff also applied for benefits through the Department of Veterans Affairs ("VA"), receiving a 20% disability rating initially, which was eventually increased to 70%. (Tr. at 41-42, 1137.)

Plaintiff received his medical care at the VA Medical Center. I first review the medical evidence back to November 2005, when plaintiff stopped working full-time, before turning to the lengthy procedural history of the case.[2]

## B. Medical Evidence

On November 23, 2005, plaintiff saw Dr. Mark Rydlewicz, his primary physician, complaining of back pain for the past month. He described the pain as constant, dull in

---

[1]He also briefly worked in real estate but realized little or no income from that employment. (Tr. at 63.)

[2]In his brief, plaintiff indicates that January 1, 2007 is an appropriate onset date for the instant application based on res judicata. However, he has not worked full-time since November 23, 2005.

nature, radiating down his legs. (Tr. at 965.) On exam, he demonstrated lumbar tenderness but full range of motion and negative straight leg raise.[3] (Tr. at 966.)

On December 2, 2005, plaintiff went to the emergency department complaining of back spasms and pain (Tr. at 961) after he was unable to get in to see his primary doctor (Tr. at 962). Plaintiff requested more time off work, and the doctor provided a release from work for three days and advised plaintiff to continue taking Ibuprofen and Flexeril.[4] (Tr. at 963.)

On December 6, 2005, plaintiff returned to Dr. Rydlewicz, reporting relief with Flexeril but continuing off work. On exam, he displayed tenderness in the lumbar spine but full range of motion and negative straight leg raise test. (Tr. at 960.) Dr. Rydlewicz ordered a physical therapy ("PT") consult. (Tr. at 961.) Plaintiff saw the therapist for an evaluation on December 30 and was scheduled for therapy sessions two to three times per month for two to three months. (Tr. at 695-97.) PT notes from January and February 2006 indicate that plaintiff reported decreased pain and stiffness after performing the exercises, but that the stiffness returned as the day went on. (Tr. at 956, 954, 953, 952.)

On February 10, 2006, plaintiff saw Deborah Schwallie, NP, at the VA requesting an increase for his chronic low back pain with muscle spasms. NP Schwallie noted that a previous CT scan revealed no spinal stenosis, but he did have a bulging disc. He was looking to be retrained in real estate. (Tr. at 471.) Plaintiff reported that he was able to do his daily activities but could no longer be a letter carrier. On exam, he was 5'7" tall and 252 pounds.

_____

[3]The straight leg raise test is done to help find the reason for low back and leg pain. If the person has pain down the back of the leg when the affected leg is raised, the test is positive, meaning one or more of the nerve roots may be compressed. Compression of the nerve roots leading to the sciatic nerve can have several causes, but the most common is a herniated disc at the lowest part of the back. http://www.webmd.com/a-to-z-guides/straight-leg-test-for-evaluating-low-back-pain-topic-overview.

[4]Flexeril (Cyclobenzaprine) is a muscle relaxant. http://www.drugs.com/flexeril.html.

His gait was normal and straight leg raise test negative; range of motion was limited by obesity. (Tr. at 472.) NP Schwallie diagnosed lumbar strain with no evidence of radiculopathy. She indicated that he would be able to work but doing a sedentary job at this point. (Tr. at 473.)

On February 21, 2006, plaintiff returned to Dr. Rydlewicz, indicating that he wanted to file for disability. He continued to complain of low back pain and stiffness and had been off work since November 23, 2005. (Tr. at 950.)

Plaintiff continued with physical therapy in March 2006, reporting relief post-treatment, after which the stiffness returned. The therapist noted that plaintiff needed to improve his compliance with a home exercise program. (Tr. at 949, 950, 948, 949.) On March 29, plaintiff reported feeling about 25-50% better than when he started. (Tr. at 945.) He was encouraged to continue with the home exercise program. (Tr. at 946.)

On April 11, 2006, plaintiff called Dr. Rydlewicz's office seeking retirement paperwork. He had been released to return to work January 2006, but the post office had no work available for him. He was seeking permanent disability. (Tr. at 944.)

On May 3, 2006, plaintiff underwent an MRI, which revealed mild bilateral inferior neuro foramen narrowing from L3-L4 to L5-S1 secondary to short pedicles of the L3-L5 vertebral bodies. The scan showed no significant nerve root impingement. (Tr. at 933-34.)

Plaintiff missed his PT appointments in May 2006, resulting in his discharge from therapy. The therapist noted that goals were not met due to non-compliance. (Tr. at 939-40, 936.)

On June 28, 2006, plaintiff called the VA requesting back surgery. He indicated that he had gained 34 pounds since November, his activity level was restricted due to pain, and he was only able to watch TV and play video games. (Tr. at 933.) Plaintiff saw Dr. Rydlewicz

on July 19, reporting walking 30-45 minutes every day and watching his diet.  (Tr. at 928.)  Dr. Rydlewicz scheduled a consult with neuro-surgery, prescribed Diclofenac[5] and Cyclobenzaprine, and referred plaintiff to weight loss management.  (Tr. at 930.)  On August 2, the neuro-surgical consultant recommended medical management, including weight loss and pain clinic evaluation.  (Tr. at 690-91.)

On August 22, 2006, plaintiff saw Dr. Rydlewicz for in-grown toenails, requesting to see podiatry to have them removed (Tr. at 925), which he did several weeks later (Tr. at 923).  On August 25, plaintiff failed to appear for a weight loss consult.  (Tr. at 689-90.)

On September 22, 2006, plaintiff saw Dr. John Stavrakos at the VA again seeking increased evaluation for service-connected low back pain with muscle spasm.  Plaintiff stated that his back pain had gotten worse since his exam on February 10, 2006.  He reported pain in his low back with a sensation of numbness shooting down his legs.  He reported using a cane at times.  (Tr. at 468.)  The May 2006 MRI showed evidence of mild bilateral inferior neuroforaminal narrowing at L3-4 to L5-S1 with no significant nerve root impingement, and an x-ray taken on February 10, 2006, showed mild degenerative changes at the low back.  Plaintiff reported independence in activities of daily living, although his girlfriend helped him put on socks.  He no longer worked for the postal service based on Dr. Rydlewicz's lifting restriction.  He took Cyclobenzaprine daily for pain.  He also received a TENS unit and physical therapy, which relieved his pain somewhat.  However, he had not followed through with physical therapy.  (Tr. at 469.)  He stood 5'7" and weighed 270 pounds, up about 20 pounds since February. (Tr. at 469-70.)  On exam, he had tenderness to palpation and some reduced range of motion but normal strength.  Straight leg raise test was negative bilaterally.

_____

[5]Diclofenac is a non-steroidal anti-inflammatory drug ("NSAID") used to treat mild to moderate pain.  http://www.drugs.com/diclofenac.html.

Dr. Stavrakos's impression was discogenic low back pain with no evidence of radiculopathy and no evidence of spinal stenosis by imaging. He opined that plaintiff's service-connected low back condition had not significantly increased by measurement of objective parameters. (Tr. at 470.) Plaintiff may well be experiencing more pain, but Dr. Stavrakos felt this was the result of his lack of attention to doing the things that would help eliminate his pain; his condition had worsened secondary to inactivity, weight gain, and lack of stretching to combat muscle spasm. (Tr. at 470-71.) Dr. Stavrakos expected that with appropriate physical therapy plaintiff would have reduction in his symptoms and perhaps become employable again. (Tr. at 471.)

On October 2, 2006, plaintiff saw Dr. Hariharan Shankar for low back pain. (Tr. at 681.) He had tried Diclofenac and Flexeril, which decreased his pain. (Tr. at 682.) On exam, he had normal sensation of the upper and lower extremities except for decreased sensation in the medial left foot, 2+ reflexes in the bilateral upper and lower extremities, 5/5 strength in the bilateral upper extremities, 5/5 in the right lower extremity, and 4/5 in the left lower extremity. (Tr. at 684.) Dr. Shankar diagnosed chronic low back pain possibly secondary to L5/S1 facet arthropathy and L SI joint arthropathy. Dr. Shankar continued Diclofenac and Flexeril, recommended PT for core strengthening, and scheduled a diagnostic facet joint injection. (Tr. at 685.) On November 27, Dr. Shankar administered diagnostic bilateral facet injections. (Tr. at 509, 511.)

On December 19, 2006, plaintiff spoke to Dr. Vincent Gathings regarding his response to the facet injections, reporting improved pain control for two weeks. Dr. Gathings planned to bring plaintiff in for another injection with a longer acting local anesthetic. (Tr. at 903.)

On January 3, 2007, plaintiff saw Dr. Rydlewicz for routine health maintenance. Dr. Rydlewicz noted: "Pt overall feels well." (Tr. at 900.) Plaintiff's diabetes and hypercholesterolemia were controlled with medication. (Tr. at 902.)

On February 21, 2007, plaintiff saw Dr. Gathings, status post intra-articular facet injections with more than two weeks of relief, a response consistent with pain of myofascial origin. On exam, he had limited range of motion. Dr. Gathings planned trigger point injections, then PT. (Tr. at 430.)

On March 1, 2007, plaintiff was seen in ophthalmology, complaining of cloudy blurred vision in the right eye and a halo around light. (Tr. at 886.) Doctors assessed him with hyperopia and "transient visual phenomenon." (Tr. at 888-89.)

On March 23, 2007, plaintiff failed to show for his scheduled PT evaluation. (Tr. at 679.) He also missed an appointment with a VA social worker on March 30. (Tr. at 886.)

On May 30, 2007, plaintiff saw Dr. Jaimee Neben, a pain specialist, regarding his low back pain, likely secondary to myofascial pain. He had received injections in February without much relief. He had also been referred to PT, had an emergency and could not make it, but did not call to let them know. He was working on weight loss this summer and would be more active. (Tr. at 424.) On exam, he had tenderness over the paraspinal muscles but full range of back motion, 5/5 strength in the lower extremities, and normal sensation over the lower extremities. (Tr. at 425.) Dr. Neben planned to re-consult PT for core strengthening exercises, recommended weight loss, and scheduled a recheck in six months. (Tr. at 426.)

On June 8, 2007, plaintiff saw physical therapy for evaluation on referral from pain management. (Tr. at 674.) He had been receiving injections, which were sometimes effective, sometimes not. He had previously undergone therapy but did not keep up with the exercises; he was willing to try again. His chief complaint was low back pain shooting into the

back of both legs. His symptoms increased with prolonged walking or standing, and decreased with pain medications. He reported attending vocational rehab five days per week and delivering pizzas six days per week. On exam, he had reduced range of motion due to lack of flexibility in the lumbar fascia. (Tr. at 675.) They planned follow up visits to progress core strengthening, flexibility, and lumbar stabilization. (Tr. at 676-77.) On July 9, plaintiff cancelled his PT appointment. (Tr. at 866.) On July 13, he reported that he did not notice much change; the exercises loosened him up, but then he returned to the same condition. (Tr. at 864-65.) The therapist noted he did not follow through on stretches. (Tr. at 865.) On July 16, plaintiff again cancelled his PT. (Tr. at 864.)

On July 19, 2007, plaintiff saw Dr. Rydlewicz for routine health maintenance. The doctor again noted: "Pt overall feels well." (Tr. at 862.) His diabetes and hypercholesterolemia remained under control. (Tr. at 864.)

On August 6, 2007, plaintiff cancelled PT, stating his car broke down. (Tr. at 861.) On August 22, he failed to show for PT, and the therapist noted that if he failed to appear for the next session he would be discharged. (Tr. at 861.)

On August 27, 2007, plaintiff went to ophthalmology complaining of a blurry right eye. (Tr. at 858-59.) Doctors found his complaints consistent with a migraine variant. (Tr. at 860.)

On November 28, 2007, plaintiff saw Dr. Robert Chapdelaine, an anesthesiologist and pain management specialist, with continued complaints of low back pain. He reported some relief with NSAID's and Flexeril. (Tr. at 417.) Dr. Chapdelaine noted the MRI from May 2006, which revealed mild bilateral inferior neuro foramen narrowing from L3-L4 to L5-S1, with no significant nerve root impingement. Dr. Chapdelaine assessed probable myofascial syndrome exacerbated by obesity and profound de-conditioning. Plaintiff continued to miss scheduled physical therapy and nutritionist appointments. Dr. Chapdelaine indicated that

plaintiff could continue on Diclofenac and Flexeril provided by his primary doctor and would benefit from weight loss and conditioning.  He had failed all prior interventions, and they had nothing new to offer.  He was to follow up with his primary doctor.  (Tr. at 421.)

On January 23, 2008, plaintiff returned to Dr. Rydlewicz, again feeling "well" overall. (Tr. at 849.)  Plaintiff was not routinely exercising but tried to watch his diet.  (Tr. at 849.)  His diabetes was controlled, but his cholesterol was not, and Dr. Rydlewicz resumed medication. (Tr. at 850.)

In February and March 2008, plaintiff was seen in ophthalmology, receiving a diagnosis of narrow angle glaucoma.  (Tr. at 843, 840-41.)  During an April vision check, he tested at 20/30 on the right and 20/20 on the left.  (Tr. at 838.)

In July 2008, plaintiff underwent aortic valve replacement surgery with Dr. Eric Lilly following complaints of chest pain and shortness of breath.  (Tr. at 465-68.)  On August 11, he reported feeling much better, able to perform his daily activities without difficulty and able to exert himself without chest pain or shortness of breath.  (Tr. at 482.)

On August 20, 2008, plaintiff reported that his vision was the same, and he was compliant with his eye drops.  (Tr. at 731.)  During a January 15, 2009, eye check, plaintiff complained of decreased near vision, but his distance vision was stable.  (Tr. at 708, 710.)

On January 29, 2009, plaintiff returned to Dr. Rydlewicz, who again noted: "Pt overall feels well."  (Tr. at 476.)  His diabetes and hypertension were controlled with medication, and he continued on Coumadin[6] after his heart surgery.  (Tr. at 478.)

---

[6]Coumadin (Warfarin) is an anticoagulant (blood thinner) used to prevent heart attacks, strokes, and blood clots in veins and arteries.  http://www.drugs.com/coumadin.html.

On May 7, 2009, plaintiff contacted the lifestyle coaching clinic at the VA, requesting enrollment. He was interested in starting an exercise program to promote weight loss. (Tr. at 1118.)

On May 14, 2009, Dr. Rydlewicz completed a multiple impairment questionnaire, listing diagnoses of diabetes, morbid obesity, spinal stenosis, lumbar spine foraminal narrowing, and aortic valve replacement, with a fair prognosis, and clinical findings of low back pain with decreased range of motion. (Tr. at 994, 1001.) He indicated that plaintiff could sit for four hours and stand/walk for four hours in an eight hour workday. (Tr. at 996.) Plaintiff could frequently lift up to 20 pounds, occasionally up to 50 pounds. Dr. Rydlewicz noted no limitations in repetitive reaching, handling, or fingering. (Tr. at 997.) He indicated that pain would periodically interfere with plaintiff's attention and concentration, that plaintiff would need unscheduled breaks four times per day of 20 minutes duration (Tr. at 999), and that plaintiff's impairments would cause absences about once per month (Tr. at 1000). These limitations applied since July 20, 2005 (Tr. at 1000), the date Dr. Rydlewicz first saw plaintiff (Tr. at 994).

On May 18, 2009, plaintiff underwent a lifestyle coaching consult. (Tr. at 1063.) Plaintiff indicated that he was very pleased with the outcome of his heart surgery; his only complaint related to incisional sensations. He was ready to work on weight loss. He reported employment as a real estate agent and delivering pizzas one day per week. He reported exercising on a treadmill at home, walking once per week for 40 minutes. He also reported planning a trip to Hawaii with girlfriend, and "his goal is to be able to climb Diamond Head." (Tr. at 1064.) Plaintiff was independent with all daily activities and ambulated without an assistive device. (Tr. at 1064.) The therapist noted a 26 pound weight gain in the past four months. Plaintiff had some exercise limitations due to back pain, which would probably

improve with weight loss; he was motivated to join the weekly group class for exercise and education.  (Tr. at 1065.)

Plaintiff had his first session on June 3, 2009, exercising on the treadmill for 45 minutes and tolerating it well.  He weighed 280 pounds, down three pounds in the past two weeks.  (Tr. at 1113.)  On June 10, he was noted to be making good progress, with his weight down five pounds.  (Tr. at 1111.)  However, he then missed the rest of his sessions in June.  (Tr. at 1108, 1105.)  He returned on July 15, apologizing for not letting the therapist know of his absence.  He indicated that he had been traveling and lost weight while on vacation, down to 274 pounds.[7]  He planned to return to weekly participation.  (Tr. at 1102.)

On July 30, 2009, plaintiff was seen for follow up in the cardiac surgery clinic.  He denied further problems, had recently started a weight loss program, and reported walking three miles most days without difficulty.  (Tr. at 1099.)

On August 3, 2009, plaintiff failed to return for his 12 week review at the lifestyle coaching clinic.  His attendance had been sporadic.  (Tr. at 1098.)

On August 12, 2009, plaintiff saw Dr. Rydlewicz for routine health maintenance.  The doctor again noted: "Pt overall feels well."  (Tr. at 1090.)  He did complain of fatigue during the day and problems falling and staying asleep at night. (Tr. at 1090.)  Dr. Rydlewicz continued medications for diabetes, cholesterol, and hypertension, and ordered a sleep study to test for possible sleep apnea.  (Tr. at 1092.)

On August 19, 2009, plaintiff stopped by the occupational therapy clinic for an unscheduled visit to report that he had been busy with work and unable to attend the exercise group.  He wanted to check his weight; he knew it was up but did not know why.  (Tr. at 1088.)

_____

[7]This note does not indicate where plaintiff went on vacation.  As discussed above, the May 18, 2009, note indicated that he planned a trip to Hawaii.  (Tr. at 1064.)

He weighed 285, up from 274 on July 15. (Tr. at 1088-89.) On September 2, plaintiff indicated that he wanted to return to the exercise group. (Tr. at 1085.) He exercised on the treadmill for 25 minutes with moderate effort. He was also shown how to perform abdominal exercises. He was to attend group one to two times per week for 12 weeks. (Tr. at 1086.) On September 4, plaintiff exercised on the treadmill for 60 minutes, tolerating it well. (Tr. at 1084-85.) On September 9, he exercised on the treadmill for 55 minutes, again tolerating it well. (Tr. at 1082.) He missed his appointment on September 11 (Tr. at 1081) but returned on September 16, exercising on the treadmill for 53 minutes (Tr. at 1080), and September 24, walking on the treadmill for 54 minutes (Tr. at 1078). On September 30, plaintiff reported that he would miss the next several sessions due to work. He exercised on the treadmill for 62 minutes. (Tr. at 1076.) The therapist noted that he had good motivation in group, but no carry over to home and sporadic attendance. (Tr. at 1077.) On October 23, plaintiff failed to appear. When last seen on September 30, plaintiff indicated he would miss sessions due to work, but he never returned. His progress with weight loss was minimal. (Tr. at 1074.)

On November 18, 2009, plaintiff underwent various x-rays at the VA. A right elbow scan revealed a small spur, otherwise normal. (Tr. at 1047.) X-rays of the feet showed minor degenerative changes and small plantar calcaneal spurs. (Tr. at 1049.) A right shoulder x-ray showed minor irregularities along the acromial undersurface, otherwise unremarkable. (Tr. at 1049.) The left shoulder was normal. (Tr. at 1050.) An x-ray of lumbar spine showed minor endplate spurring at the lower three disc levels. (Tr. at 1051.)

On November 25, 2009, plaintiff underwent a compensation and pension exam with Dr. N. Reddy at the VA. (Tr. at 1124-25.) Plaintiff stated that he remained independent in activities of daily living and participated in recreational activities such as going to the movies and baseball games. He reported using a cane when walking longer distances. He also used

foot orthotics. He indicated that he was unable to function in a competitive work environment due to chronic pain and limitations. (Tr. at 1128.) On exam, he stood 5'7" and weighed 279 pounds. He appeared mildly depressed but responded to questions adequately, with no suggestion of significant loss of concentration. Shoulder strength was 5/5, however pain was reported with range of motion testing. He also showed full range of elbow motion but with moderate to severe tenderness. Elbow region strength was normal. (Tr. at 1129.) On exam of the spine, he had tenderness but no spasm. (Tr. at 1129-30.) Dr. Reddy diagnosed chronic bilateral shoulder pain with loss of range of motion and clinical evidence of biceps tendinitis and possible mild bursitis; bilateral epicondylitis of the elbows; chronic low back pain/strain with moderately reduced range of motion; bilateral plantar fasciitis; and generalized arthritis. (Tr. at 1130.) Dr. Reddy concluded: "Given these conditions and chronic pain and aggravation from physical strain on these areas of concerns, the veteran is not capable of performing significant manual work on a competitive basis, including work as a letter carrier at the Post Office. He is essentially capable of performing light-work." (Tr. at 1131.) The VA subsequently determined an overall or combined evaluation of 70% disability, effective August 12, 2009.[8] (Tr. at 1137.)

On December 17, 2009, plaintiff saw Dr. Rydlewicz for routine health maintenance. He reported that while visiting his daughter there was a grease fire in the home, after which he developed a cough. (Tr. at 1190.) Dr. Rydlewicz provided a trial of Guafenesin.[9] (Tr. at

---

[8]In the notice, dated January 12, 2010, the VA found an increase in disability severity based on the addition of left and right upper epicondylitis (10 percent each). The notice indicated that plaintiff's rating for right and left shoulder bursitis remained 20%, chronic low back pain remained 20%, and left and right foot plantar fasciitis remained 10% for each foot. (Tr. at 1137.)

[9]Guaifenesin is an expectorant. It helps loosen congestion in the chest and throat, making it easier to cough out through the mouth. http://www.drugs.com/guaifenesin.html.

1192.)  On January 5, 2010, plaintiff was seen in urgent care with a cough and chest wall pain.  (Tr. at 1185.)  Rib x-rays were normal.  (Tr. at 1183.)

On February 1, 2010, plaintiff went to urgent care complaining of a plantar fasciitis flare-up.  (Tr. at 1173.)  He reported walking more over the past six months trying to lose weight, resulting in more pain.  His orthotics were worn out. (Tr. at 1174.) Doctors scheduled a consult with prosthetics for replacement orthotics.  (Tr. at 1176.)

On February 23, 2010, plaintiff underwent a sleep study.  (Tr. at 1196.)  It was subsequently recommended that he lose weight and use a CPAP machine.[10]  (Tr. at 1247.)

On March 17, 2010, plaintiff had an eye exam, reporting better compliance with drops.  (Tr. at 1161.)  He reported no visual changes.  (Tr. at 1164.)

On April 8, 2010, plaintiff was seen in podiatry, complaining of pain in both feet.  Dr. Daniel Toutant diagnosed plantar fasciitis, recommending exercise, weight loss, and orthotics.  (Tr. at 1275, 1308, 1309.)

On June 23, 2010, plaintiff returned to Dr. Rydlewicz, who again noted: "Overall, pt feels well." (Tr. at 1297.)  His diabetes and hypertension were controlled, and Dr. Rydlewicz continued medications.  (Tr. at 1299.)

On August 5, 2010, plaintiff followed up with cardiology.  His only complaint was a mild, dull, pulling sensation in his right upper chest wall during activity.  A recent echocardiogram showed good results.  He denied angina, palpitations, or shortness of breath, but reported mild edema in the legs.  (Tr. at 1282.)  The doctor suspected chest wall pain from a rib fracture during the surgery.  Plaintiff was willing to continue with non-surgical treatment, as

---

[10]A Continuous Positive Airway Pressure ("CPAP") machine is used to treat obstructive sleep apnea. http://www.webmd.com/sleep-disorders/sleep-apnea/features/cpap-machine.

the pain was only an annoyance. The replacement valve was working well after two years. (Tr. at 1283.)

On August 10, 2010, plaintiff returned to Dr. Rydlewicz to have a report completed for his social security claim. (Tr. at 1272.) In that report, Dr. Rydlewicz listed primary symptoms of back pain and vision difficulty. (Tr. at 1207.) He noted daily back pain, precipitated by lifting, prolonged standing, sitting, and climbing. (Tr. at 1207-08.) He opined that plaintiff could sit for two hours in an eight-hour day, stand/walk for two hours in an eight-hour day (Tr. at 1208), and frequently lift/carry up to 10 pounds, occasionally up to 20, never more (Tr. at 1209).[11] He further opined that plaintiff's pain and other symptoms would constantly interfere with attention and concentration, that plaintiff needed to take an unscheduled break every ½ hour (Tr. at 1211), and that he would be absent more than three times per month due to his impairments (Tr. at 1212). Dr. Rydlewicz indicated that these limitations applied since 2005. (Tr. at 1212.)

On September 24, 2010, plaintiff had an eye check up. (Tr. at 1261.) His compliance with treatment had improved. (Tr. at 1264.)

On December 4, 2010, plaintiff went to the emergency department, complaining of worsening back pain. (Tr. at 1249.) He denied any aggravating event. He reported sharp pain radiating down his legs but denied numbness or weakness of the extremities. Diclofenac was not helping. (Tr. at 1251.) On exam, he had tenderness to palpation of the SI joints. (Tr. at 1254.) Doctors prescribed Vicodin and advised him to follow up with his primary doctor. (Tr. at 1255, 1315.)

_____

[11]As in the previous report, Dr. Rydlewicz noted no limitations in repetitive reaching, handling, or fingering. (Tr. at 1209.)

On February 14, 2011, plaintiff returned to Dr. Rydlewicz, complaining of tinnitus in both ears.[12] (Tr. at 1380.) Dr. Rydlewicz continued medications for diabetes, hypertension, and cholesterol. For lumbago, he stopped Diclofenac and started Tramadol.[13] Finally, he ordered an audiology consult for tinnitus. (Tr. at 1383.) Plaintiff was seen in audiology on March 17. His hearing was normal for communication purposes, and he was counseled regarding tinnitus. (Tr. at 1335.)

On March 30, 2011, plaintiff returned for an eye exam. He denied changes in visual acuity but noticed his peripheral vision was a little foggy. (Tr. at 1372, 1373, 1376.) On August 4, his vision was noted to be improved/controlled on current medications. (Tr. at 1366.)

On August 5, 2011, plaintiff saw Dr. Rydlewicz for routine health maintenance. Once again, the note states: "Pt overall feels well." (Tr. at 1360.) Plaintiff's diabetes, cholesterol, and hypertension were controlled with medication. (Tr. at 1362.)

On November 10, 2011, plaintiff was seen in urgent care for right knee pain. (Tr. at 1354-55.) He noted that he was attempting to lose weight, walking on a treadmill for 60 minutes. (Tr. at 1355.) Doctors assessed likely osteoarthritis. Plaintiff declined Hydrocodone, preferring to take Tylenol. Doctors ordered a knee brace and PT consult. (Tr. at 1357.) Plaintiff was subsequently seen in prosthetics for a knee sleeve (Tr. at 1354), but the PT consult was canceled when the secretary could not contact plaintiff (Tr. at 1320-21, 1327-28).

---

[12]Tinnitus is noises (ringing, whistling, hissing) in the ears. Stedman's Medical Dictionary 1838 (27th ed. 2000).

[13]Tramadol is a narcotic-like pain reliever used to treat moderate to severe pain. http://www.drugs.com/tramadol.html.

Case 2:13-cv-01378-LA   Filed 05/29/15   Page 16 of 44   Document 18

On December 6, 2011, plaintiff saw Dr. Rydlewicz complaining of left heel pain for the last month. (Tr. at 1350.) Dr. Rydlewicz suspected a possible calcaneal spur, ordering an x-ray and podiatry consult. (Tr. at 1352.) X-rays of the left foot showed mild des planus deformity, a small plantar calcaneal spur, mild degenerative disease in the first metatarsophalangeal joint, and slight diffuse soft tissue swelling. (Tr. at 1407.) On December 22, plaintiff was seen in podiatry, reporting pain in the left heel over the past two months. He reported doing well until two months ago when pain developed while walking on the treadmill. The pain was most intense initially on upon arising, eased with walking but increased with prolonged walking and standing. He noted no significant problems with the right foot. (Tr. at 1346.) Dr. Toutant administered a cortisone injection in the left heel. Plaintiff was to continue with orthotics and use silicone heel cushions. (Tr. at 1348.)

Plaintiff returned to podiatry on January 3, 2012, indicating that he did well for about one week after the injection. He reported going to the emergency department on January 1, 2012, receiving an increased dose of Tramadol for pain and a work release for two days. (Tr. at 1339, 1343-46, 1391.) Dr. Toutant suspected the symptoms could be related to lumbar disc disease. (Tr. at 1341.) He ordered films, prescribed Gabapentin,[14] and advised plaintiff to continue with orthotics and heel cushions. (Tr. at 1341-42.) The x-rays showed mild disc degeneration throughout the lumbar spine, evidenced by narrowing of the disc spaces. (Tr. at 1406.)

On February 1, 2012, plaintiff saw Dr. Rydlewitz for routine health maintenance. (Tr. at 1448-49.) Again, the note states: "Pt overall feels well." (Tr. at 1449.) His diabetes, cholesterol, and hypertension medications were continued. For morbid obesity, Dr. Rydlewicz

---

[14]Gabapentin is used to treat nerve pain. http://www.drugs.com/gabapentin.html.

Case 2:13-cv-01378-LA   Filed 05/29/15   Page 17 of 44   Document 18

recommended exercise and diet. He also completed another report for plaintiff's disability application. (Tr. at 1452.)

In the February 1, 2012, report, Dr. Rydlewicz listed diagnoses of degenerative disc disease, glaucoma, diabetes, morbid obesity, hypertension, obstructive sleep apnea, and foot pain, with a poor prognosis. (Tr. at 1394.) He opined that, in an eight-hour day, plaintiff could sit for 0-1 hour and stand/walk 0-1 hour. (Tr. at 1396.) Plaintiff could occasionally lift up to 20 pounds and occasionally carry up to 10 pounds. Unlike the previous questionnaires, in this report Dr. Rydlewicz indicated that plaintiff's ability to engage in repetitive reaching, handling, and fingering was significantly limited. (Tr. 1397.) Dr. Rydlewicz indicated that plaintiff's pain would "seldom" interfere with attention and concentration. Asked if the impairments were ongoing, creating an expectation they would last at least 12 months, Dr. Rydlewicz checked "no." (Tr. at 1399.) Dr. Rydlewicz further indicated that plaintiff would have good and bad days, and would likely be absent more than three times per month due to his impairments. Finally, he checked the following limitations: need to avoid noise, limited vision, no pushing, no pulling, no kneeling, no bending, and no stooping. (Tr. at 1400.)

On February 22, 2012, plaintiff underwent a lumbar MRI. (Tr. at 1433.) The scan showed left L3 root compromise secondary to foraminal disc protrusion on top of facet arthropathy and congenitally short pedicles. The scan also showed moderate to marked left foraminal stenosis, worse in comparison to the prior study. Otherwise, the scan showed no significant interval change since the prior study. (Tr. at 1435.)

## C. Procedural History

### 1. Plaintiff's Application and Supporting Materials

In August 2008, plaintiff filed the instant application for disability insurance benefits, alleging a disability onset date of January 1, 2007. (Tr. at 203.) The SSA employee who

assisted plaintiff with the application detected no problems relating to back, eyesight, heart, or other problems. Plaintiff walked without difficulty, read the papers without any problems, and sat during the interview without problems. (Tr. at 284.)

In a physical activities questionnaire, plaintiff indicated that he received VA disability payments and worked 20-25 hours per week delivering pizzas. He otherwise spent his time puttering around the house, visiting family, and trying to find ways to get training for office work. He indicated that he had trouble with heavy lifting, reaching overhead or below the waist, bending, and squatting. He sometimes had trouble driving due to vision loss. (Tr. at 287.) He indicated that he went out daily for work, doctor appointments, shopping, and visiting relatives. He slept six to eight hours per night in two hour increments. He indicated that he could sit two hours at a time, stand one hour at a time, and walk two miles. He reported using no assistive devices. (Tr. at 288.) He indicated that he could sit in and drive a car for an unlimited time. He indicated that he could exercise/walk for 30 minutes or two plus miles, and that his doctor had limited him to lifting 10 pounds. (Tr. at 289.) He reported that he drove, cooked, cleaned the house, did laundry, and went up and down stairs several times per day; he occasionally shopped, went out to eat, and fixed things. (Tr. at 290.) He indicated that he lost his job with the postal service because he was not able to deliver mail due to his physical limitations, and the service could not find him work within his restrictions. (Tr. at 291.)

In a later disability report, plaintiff indicated that his vision had gotten worse; drops worked a little but not all that great. (Tr. at 309.) He also reported headaches related to his vision problems. (Tr. at 309, 315.) As for his back condition, he reported that he could barely bend and had limited movement vertically or laterally. The medications for his heart condition caused him to go to the bathroom many times per day, and his chest was still numb and sore

in spots following the surgery. He indicated that he had a hard time attaining employment, as no one wanted to take a chance on someone with back, vision, and heart issues. (Tr. at 309.) He reported that he needed additional assistance putting on his socks and shoes. When walking, he experience shortness of breath and sore legs. (Tr. at 314.)

### 2. Agency Review

On December 17, 2008, Dr. Mina Khorshidi reviewed the medical evidence and completed a physical RFC assessment for the agency, finding plaintiff capable of light work with frequent (not constant) stooping secondary to back pain and obesity. (Tr. at 435-37, 442.) Dr. Khorshidi noted some loss of peripheral vision in the right eye, but with normal visual acuity and visual field on the left his overall vision was not significantly impacted. (Tr. at 440.)

On May 9, 2009, plaintiff underwent a consultative physical examination with Dr. Mohammad Fareed. Plaintiff complained of back pain since a service-related injury in 1988. He received several epidural shots with temporary relief of pain. No surgery was advised or done. The pain was worse with bending, lifting, and prolonged standing or walking. He also complained of pain in both shoulders, which started gradually without any injury. He stated that he could walk up to 200 feet, stand up to one hour, and lift up to 10 pounds. (Tr. at 1005.) He was then working part-time five hours per week doing pizza delivery. On exam, he appeared comfortable at rest, but his mobility was slow and stiff. He stood 5'8" and weighed 283 pounds. Both shoulders had full range of motion. (Tr. at 1006.) Exam of the spine showed spasm of the paraspinal muscles in the lumbosacral area, with tenderness. (Tr. at 1006-07.) He was unable to walk on heels and toes but did not carry any device for ambulation. (Tr. at 1007.) Dr. Fareed ordered x-rays of the right knee, which revealed early

osteoarthritis (Tr. at 1003), and the lumbosacral spine, which revealed mild overall osteophyte formation (Tr. at 1004).

On July 29, 2009, Dr. Amy Moschell saw plaintiff for a consultative ophthalmology evaluation. On exam, he had uncorrected distance vision of 20/400 in the right and 20/70 in the left eye; with his glasses, he was 20/100 on the right and 20/20 on the left at distance. (Tr. at 1009.) Dr. Moschell found that plaintiff suffered an episode of angle closure glaucoma about one year ago, and he was under maintenance therapy with drops. The right optic nerve had glaucoma changes that appeared chronic and explained the right visual field changes. (Tr. at 1010.)

On July 31, 2009, Dr. George Walcott completed a physical RFC assessment for the agency, finding plaintiff capable of light work (Tr. at 1025) with no work at unprotected heights or with hazardous machinery due to loss of visual field (Tr. at 1028).

The agency denied plaintiff's application initially on December 19, 2008 (Tr. at 73, 97) and on reconsideration on July 31, 2009 (Tr. at 74, 107) so plaintiff requested a hearing before an ALJ (Tr. at 116).

### 3. First ALJ Hearing

On January 6, 2011, plaintiff appeared with counsel for his hearing before the ALJ. (Tr. at 36.) The ALJ also summoned a vocational expert ("VE").

Plaintiff testified that he was 53 years old (Tr. at 40), 5'7" tall, and 276 pounds, up from about 220 pounds when he last worked full time (Tr. at 57). He graduated high school, completed some college, and served in the Army and Air Force. (Tr. at 41.) He indicated that he received a disability rating from the VA, 20% initially but later increased to 70%. (Tr. at 41-42.) Plaintiff testified that he worked for the postal service from 1994 to November 2005. (Tr. at 43.) After leaving the post office, he obtained a job delivering pizzas, working two to three

nights per week, anywhere from five to 15 hours per week. (Tr. at 43-44, 59.) He indicated that he continued working for that employer with accommodations of no lifting above 10 pounds, and no prolonged standing, sitting, or reaching. (Tr. at 44.) He drove a pickup truck in that job, which required only a regular license, not a CDL. (Tr. at 60-61.) He tried working as a realtor in 2007 but could not handle the walking. (Tr. at 63.)

Plaintiff testified that he lived in an apartment with his girlfriend, who helped him with shopping and putting on his socks and shoes. (Tr. at 44-45.) He indicated that on a typical day he got up around 9:00, let the dogs out, fed them, then sat in front of the TV. He went to sporting events once in a while. He occasionally cooked and did some dishes, so long as he did not have to stand for a long time, more than 15 or 20 minutes (Tr. at 45), after which his back would spasm or tighten up (Tr. at 46). He would then have to sit for about 30 minutes to let his back recuperate. (Tr. at 46.) Plaintiff's apartment complex handled mowing and snow removal. He tried to do some light cleaning around the apartment. (Tr. at 46.)

In addition to his back, plaintiff indicated that his feet bothered him all the time, and he had obtained special inserts for plantar fasciitis. (Tr. at 48.) He also experienced pain in his legs and numbness in his ankles. He estimated that he could stand for about 20 minutes before he had to sit. (Tr. at 49.) He could walk for about 20 minutes before he had to stop due to pain and shortness of breath. (Tr. at 50.) He testified that he could sit for 30-45 minutes if he kept moving in the seat, 20 minutes if he sat in one spot. (Tr. at 57.)

Plaintiff testified that he took the pain reliever Diclofenac and the muscle relaxer Cyclobenzaprine. (Tr. at 51.) He also complained of fatigue and related a recent diagnosis of sleep apnea for which he had a CPAP machine. (Tr. at 51-52.) He felt a little better since he started using the machine. (Tr. at 52.) Plaintiff further testified that he underwent heart surgery in July of 2008. After the surgery, he noticed less difficulty climbing stairs. (Tr. at 53.)

Plaintiff also indicated that he had glaucoma in his right eye, which caused loss of peripheral vision. (Tr at 54.) Plaintiff testified that he tried to exercise, walking on a treadmill for about 30 minutes three times per week. (Tr. at 55.)

Plaintiff rated his back problem as the most limiting; second was the glaucoma, because he could not see much from that eye. (Tr. at 64-65.) He also indicated that he experienced sugar highs and lows related to his diabetes, where everything got blurry, about once per day for the past two years. (Tr. at 66.)

The ALJ then questioned the VE, who classified plaintiff's past work as a mail carrier as medium; mail handler as light generally, but heavy as plaintiff did it; and pizza delivery as medium generally, but sedentary to light as plaintiff did it. (Tr. at 67-68.) The ALJ then asked a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to occasional lifting of 20-50 pounds, frequent lifting of 10-20 pounds; sitting a total of four hours per day, two hours at a time; and standing and walking four hours per day, one hour at a time. (Tr. at 69.) The VE testified that such a person could work as parking lot attendant, cashier, and bench assembler. (Tr. at 69-70.) If the person missed one day per month, the jobs remained. However, two to three absences per month would exceed employer tolerance, as would four breaks per day of 20 minutes each. (Tr. at 70.) If the person could stand and walk, in combination, no more than four hours per day, that would eliminate employment. (Tr. at 71.)

### 4. First ALJ Decision

On March 25, 2011, the ALJ issued an unfavorable decision. (Tr. at 75.) Following the familiar five-step evaluation process,[15] the ALJ first determined that plaintiff had not

_____

[15]Under this process, the ALJ determines: (1) whether the claimant is working, i.e., engaging in substantial gainful activity ("SGA"); (2) if not, whether he suffers from a severe

engaged in substantial gainful activity since January 1, 2007, the alleged disability onset date. The ALJ noted that after he stopped working at the post office, plaintiff started delivering pizzas, providing various statements about the number of hours he worked. His earnings at that job approached but did not reach SGA levels in 2006 and 2007; he earned less in 2008 and 2009. (Tr. at 80.) The ALJ stated that, given plaintiff's monthly VA benefit, "one might infer that he may simply choose to work less hours." (Tr. at 80-81.) Plaintiff also worked as a real estate agent after the alleged onset date, although there was no evidence as to what he was paid for those activities. Although they did not constitute SGA, the ALJ considered plaintiff's ability to perform these work activities in analyzing credibility and formulating RFC. (Tr. at 81.)

The ALJ next determined that plaintiff suffered from the severe impairments of degenerative disc disease of the lumbar spine, obesity, glaucoma, plantar fasciitis, sleep apnea, and status post aortic valve replacement, none of which met or equaled a Listing. The ALJ noted treatment for shoulder bursitis prior to the onset date, but no treatment since then. The ALJ also noted plaintiff's diabetes diagnosis but found it well controlled with medication. He accordingly found these two impairments non-severe. (Tr. at 81.)

The ALJ then determined that plaintiff retained the RFC to perform a range of light work: sitting and standing/walking for four hours each in an eight-hour day, and lifting 20-50 pounds occasionally and 10-20 pounds frequently. (Tr. at 81.) In making this finding, the ALJ

_____

impairment or impairments; (3) if so, whether any of those impairments qualify as presumptively disabling under the agency's Listings; (4) if not, whether the claimant retains the residual functional capacity ("RFC") to perform his past work; and (5) if not, whether he can perform any other work in the national economy. See, e.g., Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011).

considered the credibility of plaintiff's alleged symptoms and the medical opinion evidence. Regarding the former, the ALJ stated:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(Tr. at 82.)

Plaintiff alleged that his primary problem was his back, which limited his ability to walk, stand, or reach. The ALJ noted that while plaintiff had been treated for back pain, the medical evidence did not support symptoms so severe that they would prohibit him from working within this RFC. For instance, around the time of the alleged disability onset, plaintiff visited a pain clinic for injections, and on exam he exhibited some muscle tenderness but full spinal range of motion and normal strength and senses. A May 2006 MRI of the lumbar spine revealed mild narrowing from levels L3-4 to L5-S1 but no nerve root impingement. Plaintiff participated in physical therapy, and the therapist noted that after the exercises plaintiff's "back feels fine." (Tr. at 82.) In November 2007, plaintiff stopped having regular medical care for his back when he discharged from the pain clinic because they had no further treatment to offer him. At that time, he was assessed with probable mysofascial syndrome exacerbated by obesity and profound de-conditioning, yet he continued to miss physical therapy and nutritionist appointments. (Tr. at 82.) Since then, he had received almost no treatment for his back aside from an exacerbation in December 2010. (Tr. at 82-83.) The May 2009 consultative exam and the November 2009 disability exam at the VA showed few positive clinical findings,. and the VA examiner concluded that plaintiff was capable of light work. At a previous VA exam, the provider attributed plaintiff's back pain to inactivity, weight gain, and lack of

stretching to combat muscle spasm. In sum, while plaintiff experienced some back discomfort, his condition had been stable without much treatment or medication, and he had only mild diagnostic findings. The ALJ accordingly found that the medical evidence did not demonstrate abnormalities that would interfere with plaintiff's ability to perform the range of work in the RFC. (Tr. at 83.)

Plaintiff identified glaucoma as his second most limiting condition, but the ALJ concluded that the medical evidence did not reveal findings indicating that plaintiff was unable to work due to his reduced vision. The ALJ noted that plaintiff continued to drive as part of his part-time pizza delivery job, which suggested that his reduced vision was not very limiting. The medical evidence also showed that with treatment, including eye drops, plaintiff's glaucoma was controlled. At the July 2009 consultative exam, plaintiff had corrected vision of 20/40 on the right and 20/20 on the left. He had some visual field loss on the right but essentially full on the left. (Tr. at 83.)

Regarding plaintiff's other conditions, the ALJ noted improvement in exercise capability, and no shortness of breath, chest pain, or dizziness after the July 2008 heart surgery. (Tr. at 83.) Plaintiff was diagnosed with sleep apnea but felt better with the CPAP machine. (Tr. at 83-84.) Plaintiff had planter fasciitis for many years, wearing orthotics. He reported increased foot discomfort on February 2010, but his condition improved with new orthotics. Finally, the ALJ noted plaintiff's obesity, with a BMI of 44.4, which may increase the pain and limitations he experienced from his other conditions. (Tr. at 84.)

The ALJ also found plaintiff's daily activities inconsistent with a disabling condition. For example, in August 2008, plaintiff reported being able to perform activities of daily living without difficulty. He was also able to work part-time delivering pizzas and as a realtor. In May 2009, he revealed that he was planning a trip to Hawaii and wanted to climb Diamond

Head.  The record also documented that plaintiff drove, went to doctor appointments, shopped, cooked, cleaned, did laundry, went out to eat, attended sporting events, and fixed things.  Given these reported activities, the ALJ inferred that plaintiff was able to work some type of job.  (Tr. at 84.)

Further, considering the entire record, the ALJ found plaintiff's subjective complaints not entirely credible.  Despite claiming debilitating pain, plaintiff did not report such severe symptoms to his doctor and required only intermittent, conservative treatment.  At various points, plaintiff's doctor reported that plaintiff felt "well."  At the field office, plaintiff walked without difficulty and exhibited no visual problems in completing paperwork.  Plaintiff also provided conflicting statements regarding how long he could sit, stand, and walk.  For instance, at the hearing he said he could walk for 20-25 minutes but later acknowledged walking on a treadmill 30 minutes three times per week.  In previous reports, plaintiff stated he had an unlimited ability to sit and could walk over two miles.  (Tr. at 84.)  He also reported exercising at the YMCA, walking there six block each way.  (Tr. at 84-85.)  He further reported planning to climb Diamond Head.  Based on these inconsistencies, the ALJ found plaintiff's testimony "not entirely forthright."  (Tr. at 85.)

Regarding the opinion evidence, the ALJ noted that in May 2009 Dr. Rydlewicz, plaintiff's primary care physician, opined that plaintiff could sit and stand/walk for four hours each per day, and lift and carry 10-20 pounds frequently.  He further determined that plaintiff would need four unscheduled 20 minute work breaks.  In August 2010, Dr. Rydlewicz completed a second report, indicating that plaintiff could only sit and stand/walk for two hours each per day, and lift/carry 10-20 pounds occasionally.  Dr. Rydlewicz anticipated that, because of his impairments, plaintiff would be absent from work more than three times per month.  He stated that plaintiff had these limitations since 2005.  (Tr. at 85.)

The ALJ gave some weight to the first report, which essentially found plaintiff capable of a range of light work, consistent with the November 2009 VA assessment, as well as plaintiff's part-time work delivering pizzas. However, Dr. Rydlewicz provided no explanation for the estimated number of breaks and did not attribute this limitation to any particular impairment; the ALJ also found this limitation inconsistent with plaintiff's activities, including exercising on a treadmill and traveling to Hawaii. The ALJ gave substantial weight to the rest of the report because it was supported by the record as a whole. (Tr. at 85.)

However, the ALJ gave little weight to Dr. Rydlewicz's second report. The doctor stated that the limitations related back to 2005, making them contrary to the less severe limitations assessed in the May 2009 report, which was also intended to apply to plaintiff since 2005. Further, while Dr. Rydlewicz assessed severely decreased functional ability in the second report, the medical record did not show that plaintiff's condition had deteriorated at all. To the contrary, plaintiff told the doctor he felt well in August 2009 and June 2010. Plaintiff's daily activities also showed that his condition did not decline during this period. (Tr. at 85.)

Finally, the ALJ found the RFC supported by the state agency medical consultants, who concluded that plaintiff could perform a range of light work. Because these opinions were generally consistent with the record, the ALJ assigned them significant weight. (Tr. at 86.)

Based on this RFC, the ALJ concluded that plaintiff could not return to past work for the postal service, but that he could perform other jobs identified by the VE, including assembler, cashier, and parking lot attendant. (Tr. at 86-87.) The ALJ accordingly found plaintiff not disabled. (Tr. at 87.)

### 5.    Appeals Council Remand

Plaintiff requested review by the Appeals Council, and on August 26, 2011, the Council remanded the case to the ALJ.  (Tr. at 93.)  The Council instructed the ALJ to give further consideration to the treating source statements and plaintiff's RFC and obtain further vocational evidence as needed.  (Tr. at 95.)

### 6.    Second Hearing

On April 16, 2012, plaintiff appeared for his second hearing before the ALJ.  (Tr. at 1483.)  Plaintiff testified that he continued to deliver pizzas part-time, but he had reduced his hours to eleven per week, working two days – Monday and Friday.  (Tr. at 1486-87, 1511.)  He indicated that his back condition had worsened since the first hearing, and he had a hard time staying on his feet, lifting, bending, and reaching.  (Tr. at 1487.)  He also complained of worsening problems with his feet; orthotics helped to a point, although he still had trouble walking.  (Tr. at 1488-89.)  He indicated that he began to experience severe pain after five minutes on his feet.  He testified that he had been trying to exercise, walking 30 minutes per day on a treadmill, but the heel pain worsened.  (Tr. at 1489.)  He had been using a cane since November, around the time his heel pain started.  He also complained of numbness on the outer side of both ankles.  (Tr. at 1490.)  He further noted daily swelling, for which he took water pills.  (Tr. at 1491.)  He testified that he could walk one or two blocks.  (Tr. at 1492.)  He also complained of pain related to a cracked rib from his surgery.  (Tr. at 1493.)  He recently underwent an MRI, which showed that the stenosis was getting worse, putting pressure on the nerves going to his feet, as well as some bulging discs.  He also complained of headaches triggered by his eye condition occurring weekly.  (Tr. at 1494-95.)  He testified that pain would preclude him  from working full-time.  (Tr. at 1496.)

Plaintiff testified that he weighed 290 pounds, up from 200 pounds when he was working. (Tr. at 1497.) He continued to live in an apartment with a friend, who helped with day-to-day activities, and received VA disability benefits. (Tr. at 1498.) For pain, he had changed from Diclofenac to Tramadol. He started with one pill twice per day but was up to two pills four times per day for pain. (Tr. at 1506.) He also had codeine and Vicodin for particularly severe headache pain. (Tr. at 1507.) Aside from his part-time job, plaintiff spent time at home watching TV. He used to go to Brewers' games, but the pain had become too intense. He no longer used the treadmill. (Tr. at 1508.) He tried working in real estate, but the pain prevented it. He last sold a house in 2010. He sold five houses in a four year period. (Tr. at 1509.) He worked about 20 hours per week in real estate for straight commission. (Tr. at 1513.) He only delivered pizzas in his current job; he did not make pizzas, clean, or do other duties. (Tr. at 1510.)

The ALJ again summoned a VE, who classified plaintiff's past work as follows: mail carrier, medium; mail handler, light, medium as plaintiff did it; material handler, heavy, medium as plaintiff did it; real estate agent, light; and pizza delivery, medium, sedentary as plaintiff did it. (Tr. at 1513-14.) The ALJ then posed a hypothetical question, assuming a person of plaintiff's age, education, and work experience, limited to light work with no sitting more than two hours at a time, no standing more than one hour at a time, and no walking more than 30 minutes at a time. The VE responded that such a person could work as a real estate agent, as well as other jobs including counter clerk, courier, and delivery driver. (Tr. at 1515.) If the ALJ added a limitation of total time sitting not to exceed four hours and total time standing/walking not to exceed four hours, the person could still work as a counter clerk. If the person required four unscheduled breaks of 20 minutes duration, there would be no jobs. (Tr. at 1516.) Similarly, if the person missed three days of work per month due to pain

-30-

complaints, there would be no jobs.  (Tr. at 1517-18.)  One day per month would be acceptable; more than that would not.  (Tr. at 1518.)

### 7.    Second ALJ Decision

On August 20, 2012, the ALJ again issued an unfavorable decision.  (Tr. at 16.)  The ALJ found that plaintiff had not engaged in substantial gainful activity since January 1, 2007, the alleged onset date, and that he suffered from the severe impairments of degenerative disc disease, obesity, plantar fasciitis, sleep apnea, and status post aortic valve replacement, none of which met or equaled a Listing.  (Tr. at 27-28.)  The ALJ then determined that plaintiff retained the RFC to perform light work, except sitting no more than two hours at a time, standing no more than one hour at a time, and walking no more than 30 minutes at a time. (Tr. at 28.)  The ALJ stood by his previous analysis of the medical evidence and plaintiff's credibility.  He also stood by his criticism of Dr. Rydlewicz's August 2010 report, given the previous assessment of May 2009 suggesting greater capacity – "an assessment that was presumably deemed unsatisfactory by claimant and his attorney." (Tr. at 24.)  The ALJ further questioned Dr. Rydlewicz's reliability given the February 2012 report, which further reduced plaintiff's capacity and added manipulative limitations even though there had been little or no reference to major problems with the upper extremities.  Dr. Rydlewicz also opined that plaintiff would miss more than three days of work per month, even though the progress note from the day the doctor completed the form stated, "overall feels well." (Tr. at 24.)

The ALJ noted that in his previous decision he had limited plaintiff to light work with no standing or walking more than four hours in an eight-hour workday.  (Tr. at 25.)  The ALJ decided to slightly modify the RFC to provide for no prolonged standing/walking, rather than a limitation to no more than four hours per day. (Tr. at 26.)  The ALJ concluded that plaintiff's primary medical problem was the combination of degenerative disc disease and obesity,

although the foot complaints would also affect prolonged weight bearing as well. Although plaintiff used a cane at the hearing, "it is by no means clear that the cane was prescribed or necessary." (Tr. at 26.) As noted in the previous decision, plaintiff's activities and the medical records suggested that plaintiff was far from sedentary in terms of his weight bearing capacity, and nothing in the more recent records from the VA changed this perception. (Tr. at 26.) The ALJ accordingly found plaintiff capable of light work with no prolonged standing or walking. The ALJ gave some weight to the state agency doctors and also to the initial report completed by Dr. Rydlewicz, "done at a time when he may have been less subject to the whims of claimant and his efforts at influencing the doctor in his efforts to secure Social Security disability benefits." (Tr. at 26.) The ALJ gave no weight to Dr. Rydlewicz's other two reports. (Tr. at 26.) The ALJ concluded: "This case essentially comes down to the issues of pain and credibility, and simply stated [plaintiff] is not very credible. There is little doubt that strong secondary gain factors are at play here." (Tr. at 26-27.)

Given this RFC, the ALJ determined that plaintiff could not perform his past work as a letter carrier. Relying on the VE's testimony, the ALJ concluded that plaintiff could perform other jobs such as counter clerk, courier, and delivery driver. (Tr. at 27-28.) He accordingly found plaintiff not disabled. (Tr. at 28-29.)

Plaintiff again sought review by the Appeals Council. (Tr. at 374.) On October 9, 2013, the Council denied plaintiff's request for review. (Tr. at 1.) This action followed.

## II. DISCUSSION

### A.      Standard of Review

The reviewing court will reverse an ALJ's decision only if it is not supported by "substantial evidence," meaning such relevant evidence as a reasonable mind would accept as adequate to support a conclusion, Curvin v. Colvin, 778 F.3d 645, 648 (7th Cir. 2015), or

if it is the result of an error of law, <u>Farrell v. Astrue</u>, 692 F.3d 767, 770 (7th Cir. 2012). In rendering a decision, the ALJ must build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence. <u>Pepper v. Colvin</u>, 712 F.3d 351, 362 (7th Cir. 2013).

**B.   Analysis**

Plaintiff argues that the ALJ erred in (1) discounting Dr. Rydlewicz's reports; (2) evaluating the credibility of plaintiff's claims; (3) considering the impact of obesity on plaintiff's ability to work; and (4) by failing to consider plaintiff's VA disability rating. I address each contention in turn.

**1.   Treating Source Reports**

Treating source reports are entitled to special consideration in social security proceedings. An ALJ must give "controlling weight" to a treating doctor's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. <u>Punzio v. Astrue</u>, 630 F.3d 704, 710 (7th Cir. 2011). If the ALJ finds that the report is not entitled to controlling weight, he must determine what value the report does deserve, considering the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and supportability of the physician's opinion. <u>Scott v. Astrue</u>, 647 F.3d 734, 740 (7th Cir. 2011). The ALJ must always give a sound explanation for rejecting a treating source report. <u>Punzio</u>, 630 F.3d at 710.

As discussed above, Dr. Rydlewicz prepared three reports in this case. In the May 2009 questionnaire, he indicated that plaintiff could sit for four hours and stand/walk for four hours in an eight-hour workday (Tr. at 996); could frequently lift up to 20 pounds, occasionally up to 50 pounds (Tr. at 997); would need unscheduled breaks four times per day of 20

minutes' duration (Tr. at 999); and would be absent once per month due to his impairments (Tr. at 1000). Dr. Rydlewicz indicated that these limitations applied since July 20, 2005, which was the date he first saw plaintiff. (Tr. at 994, 1000.)

In the August 2010 questionnaire, Dr. Rydlewicz reduced plaintiff's sitting and standing/walking tolerance to two hours (each) in an eight-hour day (Tr. at 1208), and his lifting ability to 10 pounds frequently, 20 pounds occasionally (Tr. at 1209). He further indicated that plaintiff needed to take an unscheduled break every ½ hour (Tr. at 1211) and would be absent more than three times per month due to his impairments (Tr. at 1212). Dr. Rydlewicz again indicated that these limitations applied since 2005. (Tr. at 1212.)

Finally, in his February 2012 report, Dr. Rydlewicz further reduced plaintiff's sitting and standing/walking tolerance to 0-1 hour each in an eight-hour day. (Tr. at 1396.) He also added limitations in repetitive reaching, handling, and fingering (Tr. 1397), and further indicated that plaintiff needed to avoid noise, had limited vision, and could not engage in pushing, pulling, kneeling, bending, and stooping (Tr. at 1400).[16]

As also summarized above, in his March 2011 decision, the ALJ gave some weight to Dr. Rydlewicz's May 2009 report, which essentially deemed plaintiff capable of a range of light work, consistent with the November 2009 VA assessment and plaintiff's part-time work delivering pizzas. However, the ALJ rejected Dr. Rydlewicz's opinion regarding number of breaks, noting that the doctor provided no explanation for and did not attribute this limitation to any particular impairment; the ALJ also found this limitation inconsistent with plaintiff's activities. (Tr. at 85.) The ALJ gave little weight to Dr. Rydlewicz's August 2010 report, noting that the doctor dated these more severe limitations back to 2005, making them contrary to the

---

[16]The doctor did not in this report indicate the earliest date from which these limitations applied. (Tr. at 1400.)

less severe limitations assessed in the May 2009 report, which was also intended to apply to plaintiff since 2005. The ALJ further found that the medical record did not show deterioration in plaintiff's condition between the dates of the two reports; nor did plaintiff's activities suggest a decline during this period. (Tr. at 85.) The ALJ assigned significant weight to the opinions of the state agency consultants that plaintiff was capable of a range of light exertional level activity. (Tr. at 86.)

In his August 2012 decision, the ALJ again discounted Dr. Rydlewicz's August 2010 report, given the previous assessment of May 2009 suggesting greater capacity. (Tr. at 24.) The ALJ also questioned Dr. Rydlewicz's reliability given the February 2012 report, which further reduced plaintiff's capacity and added manipulative limitations even though there had been little or no reference to problems with the upper extremities. The ALJ further questioned Dr. Rydlewicz's opinion regarding absences, noting that on the day he completed the form Dr. Rydlewicz noted that plaintiff "overall feels well." (Tr. at 24.) The ALJ gave some weight to the opinions of the state agency doctors that plaintiff could perform a range of light work and also to the initial report from Dr. Rydlewicz; he gave Dr. Rydlewicz's other two reports no weight. (Tr. at 26.)

Plaintiff argues that the ALJ erred by picking and choosing only particular findings from Dr. Rydlewicz's reports without good cause for doing so. While an ALJ may not selectively discuss some portions of a doctor's report while ignoring others, see, e.g., Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000), there is no requirement that an ALJ accept every opinion within a given report, see SSR 96-5p, 1996 SSR LEXIS 2, at *12 ("Adjudicators must remember . . . that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, . . . and that it may be necessary

to decide whether to adopt or not adopt each one."). The ALJ was entitled to accept some of Dr. Rydlewicz's opinions and reject others, so long as he provided an explanation.

Plaintiff next accuses the ALJ of mischaracterizing the May 2009 report (which limited him to standing/walking four hours in an eight-hour workday) as consistent with light work (which requires "standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."). SSR 83-10, 1983 SSR LEXIS 30, at *14. The ALJ found the May 2009 report consistent with "a range of light work" (Tr. at 85, emphasis added); he did not find the report consistent with the entire range of light work. Moreover, in his August 2012 decision, the ALJ modified the RFC to exclude prolonged sitting, standing, and walking, rather than setting a total limit within the work day. (Tr. at 26.)

Plaintiff also challenges the ALJ's reliance on Dr. Reddy's opinion that plaintiff was capable of light work (Tr. at 85, 1131) because it is unknown whether Dr. Reddy referred to light work as defined under SSA regulations. The ALJ did not err in citing Dr. Reddy's opinion as one piece of evidence corroborating the reports of the physicians who did evaluate the case under the regulations. Nor did the ALJ err in considering plaintiff's part-time work delivering pizzas, done at the light level, as another piece of evidence supporting the RFC. See Williams-Overstreet v. Astrue, 364 Fed. Appx. 271, 276-77 (7th Cir. 2010) ("Although a claimant with a job may still be found disabled, an ALJ's assessment of residual functional capacity must be based on the relevant evidence in the record, which includes reports of daily activities and evidence from attempts to work.") (internal citations and quote marks omitted).[17] The same is true of plaintiff's exercise on a treadmill and planned trip to Hawaii. While these

_____

[17]The ALJ also discussed how plaintiff's ability to do this work undercut his claims of disabling limitations, particularly with regard to plaintiff's vision. (Tr. at 26.)

Case 2:13-cv-01378-LA   Filed 05/29/15   Page 36 of 44   Document 18

activities, standing alone, would not suffice to reject a treating source report, the ALJ did not err in mentioning them as part of his analysis.

Plaintiff further contends that there was nothing illogical or suspicious about Dr. Rydlewicz finding plaintiff more limited in the August 2010 report based on 15 additional months of treatment and evaluation. ALJs are supposed to consider the consistency of a treating source's report with the evidence, including other evidence from that same source, see, e.g., Denton v. Astrue, 596 F.3d 419, 424-25 (7th Cir. 2010), and as the ALJ noted here, nothing in the treatment records during the intervening period suggested that plaintiff's condition had significantly worsened or that plaintiff was more limited than previously believed. To the contrary, in August 2009 and June 2010, Dr. Rydlewicz indicated that plaintiff "feels well." (Tr. at 1090, 1297.) Plaintiff argues that the ALJ should have contacted Dr. Rydelwicz about the perceived discrepancy, but that step is ordinarily required only when the evidence is inadequate to determine the basis for the doctor's opinion. See SSR 96-5p, 1996 SSR LEXIS 2, at *16-17. There is no requirement that the ALJ re-contact a doctor to explain inconsistent opinions. See, e.g., Martinez v. Colvin, No. 12 C 3888, 2013 U.S. Dist. LEXIS 178049, at *33 (N.D. Ill. Dec. 18, 2013).

Finally, plaintiff faults the ALJ for relying on the state agency consultants, noting that the opinion of a non-examining physician does not, by itself, suffice to reject a treating source report. Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003). The ALJ did not discount Dr. Rydlewicz's reports based solely on the contrary opinions of the consultants. The ALJ also considered the consistency of Dr. Rydlewicz's reports with each other and with the treatment notes, Dr. Rydlewicz's failure to explain the basis for the increasingly severe restrictions he imposed, the opinions of examining VA physician Dr. Reddy and examining SSA consultant Dr. Fareed, and plaintiff's daily activities. The ALJ touched on the pertinent factors, including

the length of the treatment relationship, frequency of visits, treatment provided, and the consistency and supportability of Dr. Rydlewicz's opinions. (Tr. at 24, 26, 83-85.) In sum, I cannot conclude that the ALJ erred in considering the treating source reports.

### 2.    Credibility

In making a credibility determination, the ALJ must first decide whether the claimant suffers from medically determinable impairments that could reasonably be expected to produce the pain or other symptoms the claimant alleges. If the claimant has no such impairments, the alleged symptoms cannot be found to affect his ability to work. If such impairments are shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms to determine the extent to which they limit the claimant's ability to work. SSR 96-7p, 1996 SSR LEXIS 4, at *5-6. In making this determination, the ALJ must consider, in addition to the medical evidence, the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. Id. at *8. After considering these factors, the ALJ must provide specific reasons for his credibility determination, supported by the evidence in the case record. Id. at *12. So long as the ALJ gives specific reasons supported by the record, the court will not overturn his credibility determination unless it is "patently wrong." Curvin, 778 F.3d at 651.

As with his evaluation of Dr. Rydlewicz's reports, the ALJ in his August 2012 decision adopted his previous evaluation of plaintiff's credibility. (Tr. at 24.) In the March 2011 decision, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."[18] (Tr. at 82.)

In support of this finding, the ALJ first discussed the medical evidence. While plaintiff received treatment for back pain, the medical evidence did not support symptoms so severe that they would prohibit him from working within the ALJ's RFC. The ALJ noted plaintiff's mild diagnostic findings, limited treatment, and inconsistent compliance with the measures recommended by his doctors. (Tr. at 82-83.) Plaintiff identified glaucoma as his second most limiting condition, but the ALJ noted that plaintiff continued to drive as part of his part-time pizza delivery job, and the medical evidence showed that with treatment, including eye drops, his glaucoma was controlled. (Tr. at 83.) Regarding plaintiff's other conditions, the ALJ noted improvement in exercise capability, and no shortness of breath, chest pain, or dizziness after the July 2008 heart surgery. (Tr. at 83.) Plaintiff was also diagnosed with sleep apnea but felt better with the CPAP machine. (Tr. at 83-84.) Plaintiff had plantar fasciitis for many years, but his condition improved with orthotics. Finally, the ALJ noted plaintiff's obesity, which he accepted could increase the pain and limitations plaintiff experienced from his other conditions. (Tr. at 84.)

---

[18]While the Seventh Circuit has criticized use of this "template," the court of appeals has also held that it may be deemed harmless if the ALJ goes on to provide specific reasons for his credibility determination. See, e.g.,Pepper, 712 F.3d at 367-68; Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012). The ALJ did so here.

Second, the ALJ found plaintiff's daily activities inconsistent with a disabling condition. The ALJ noted that in August 2008 plaintiff reported the ability to perform activities of daily living without difficulty; in May 2009, he reported a trip to Hawaii, where he planned to climb Diamond Head; and he worked part time delivering pizzas throughout the period under review. The ALJ also noted plaintiff's report that he drove, went to doctor appointments, shopped, cooked, cleaned, did laundry, went out to eat, attended sporting events, and fixed things. (Tr. at 84.)

Third, the ALJ noted inconsistencies in the record. Despite claiming debilitating pain, plaintiff did not report severe symptoms to his doctor and required only intermittent, conservative treatment, and plaintiff's doctor frequently reported that plaintiff felt "well." Plaintiff also provided conflicting statements regarding how long he could sit, stand, and walk. (Tr. at 84-85.)

Plaintiff argues that the ALJ erred by relying on the objective medical evidence. While it is true that an ALJ may not reject a claimant's testimony <u>solely</u> because it is not substantiated by objective medical evidence, <u>e.g.</u>, <u>Hall v. Colvin</u>, 778 F.3d 688, 691 (7th Cir. 2015), the ALJ did not do that here. As discussed, he provided several reasons for discounting plaintiff's testimony. ALJs are supposed to consider the medical evidence as part of their analysis.[19] <u>See, e.g.</u>, <u>Simila v. Astrue</u>, 573 F.3d 503, 519 (7th Cir. 2009).

Plaintiff also challenges the ALJ's reliance on his daily activities, noting that the Seventh Circuit has chastised ALJs for failing to recognize the differences between activities

_____

[19]Plaintiff faults the ALJ for citing the treatment notes describing him as feeling "well." <u>See</u> <u>Bauer v. Astrue</u>, 532 F.3d 606, 609 (7th Cir. 2008) (criticizing ALJ's reliance on "hopeful remarks" in the treatment notes). These were not scattered remarks reflecting ups and downs; as the ALJ noted, the treatment notes from Dr. Rydlewicz consistently stated that plaintiff "overall feels well." (Tr. at 84, 900, 862, 849, 1090, 1360, 1449.) It was not error for the ALJ to note this as part of his analysis.

of daily living and activities in a full-time job.  See, e.g., Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012).  As with plaintiff's previous assignment of error, however, there is nothing wrong with considering such activities as part of the analysis.  Further, the ALJ did not equate plaintiff's activities with full-time work; rather, he contrasted those activities with plaintiff's claims of disabling pain and other limitations, including visual impairment.

Finally, plaintiff contends that the ALJ failed to identify significant inconsistencies between his statements regarding his capacity to sit, stand, and walk.  Plaintiff does not dispute the ALJ's citation of different reported standing tolerances, and it was not unreasonable for the ALJ to note the differences as part of his analysis.  The ALJ was entitled to conclude, for instance, that plaintiff's hearing testimony of 20 minutes walking tolerance conflicted with his previous statement to a provider that he was walking 40 minutes at a time and planned to climb Diamond Head in Hawaii.  (Tr. at 85, 1064.)

The ALJ gave specific reasons, grounded in the evidence, and his conclusion was not patently wrong.  Therefore, the credibility determination must stand.

### 3.    Obesity

While obesity is not itself a listed impairment, the "combined effects of obesity with other impairments may be greater than might be expected without obesity.  For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone."  SSR 02-1p, 2002 SSR LEXIS 1, at *17.  Obesity may also affect exertional functions such as sitting, standing, and walking, or postural functions such as climbing, stooping, and crouching.  Id. at *16-17.  The ALJ is accordingly required to consider the impact of obesity on the claimant's ability to perform routine movement and necessary physical activity and to sustain such activity on a regular and continuing basis.  Id. at *17.

In the present case, in his March 2011 decision, the ALJ stated:

> The medical evidence also documents that the claimant is obese and has a BMI of 44.4. Pursuant to Social Security Ruling 02-1p, the combined effects of obesity with other impairments may be greater than might be expected without obesity. For instance, that Ruling also advises that, if someone has obesity with arthritis affecting a weight-bearing joint, he or she may have more pain and limitation than might be expected from arthritis alone. In this case, even though the claimant does not suffer from arthritis, the principle is still applicable to the claimant's back and foot pain conditions. The claimant's obesity may increase the pain and limitation that he experiences regarding these conditions[.]

(Tr. at 84.) In the August 2012 decision, the ALJ stated: "As noted in the earlier decision, obesity also plays an important factor, impacting not only his weight-bearing joints, but representing a likely contributing factor to his diabetes, hypertension and hypercholesterolemia." (Tr. at 22.) And that: "[Plaintiff's] primary medical problem is the combination of degenerative disc disease and obesity, although the foot complaints would also affect prolonged weight bearing as well." (Tr. at 26.)

The ALJ fulfilled his obligations under SSR 02-1p, considering the impact of obesity along with plaintiff's other impairments in setting RFC. Plaintiff cites no authority requiring the ALJ to specify how obesity in particular limited plaintiff's functional capacity. See Sienkiewicz v. Barnhart, 409 F.3d 798, 803 (7th Cir. 2005) (explaining that the "ALJ must consider the effect of an applicant's obesity in conjunction with her other impairments" in setting RFC). Plaintiff contends that it is hard to fathom how a person approaching 300 pounds could be on his feet most of the day, as required for light work. The ALJ must make a individualized assessment of the impact of obesity on the claimant's functioning, see Prochaska v. Barnhart, 454 F.3d 731, 736 (7th Cir. 2006); there is no presumption that a person becomes disabled because of his weight, see Castile v. Astrue, 617 F.3d 923, 928 (7th Cir. 2010). Moreover, the ALJ did not find plaintiff capable of the full range of light work in this case. In the August 2012 decision, he limited plaintiff from prolonged sitting, standing, and walking, meaning no

sitting more than two hours at a time, no standing more than one hour at a time, and no walking more than 30 minutes at a time. (Tr. at 28.) Plaintiff cites no medical evidence requiring the imposition of greater restrictions due to his weight. The ALJ accordingly did not err in his consideration of plaintiff's obesity.

### 4. VA Disability Determination

The disability decision of another governmental agency is not binding on the SSA. SSR 06-03p, 2006 SSR LEXIS 5, at *16. This is so because such decisions are made based on the other agency's rules, not SSA guidelines. Id. Nevertheless, because the ALJ is required to consider all of the evidence in the case record, decisions by other governmental agencies "cannot be ignored." Id. at *17. "These decisions, and the evidence used to make these decisions, may provide insight into the individual's mental and physical impairment(s) and show the degree of disability determined by these agencies based on their rules." Id. The Seventh Circuit has held that an ALJ should give a VA disability determination "some weight." Allord v. Barnhart, 455 F.3d 818, 820 (7th Cir. 2006).

The ALJ failed to consider, in either of his decisions, plaintiff's 70% disability rating from the VA, but the error was harmless. See Schomas, 732 F.3d at 707-08 (applying harmless error to ALJ's failure to explain his analysis of certain evidence). As the Commissioner notes, the relevance of the VA's decision is not the percentage it assessed under its rules, but rather the underlying findings and how they relate to SSA disability guidelines. See Hall, 778 F.3d at 691 ("[A]lthough the VA rated Hall 'only' 70 percent disabled, it pronounced him totally unemployable by reason of his disability, see 38 C.F.R. § 4.16, which equates to a finding of total disability under the regulations of the Social Security Administration."). Here, the ALJ overlooked the VA's percentage, but he did consider the underlying impairments and the reports of the VA doctors upon which the disability rating

-43-

was based, including the opinion of Dr. Reddy that plaintiff could perform light work. (Tr. at 83, 85, 470-71, 1131.) See Weathington v. Colvin, No. 12-cv-410, 2013 U.S. Dist. LEXIS 135279, at *34-35 (S.D. Ind. Sept. 20, 2013) (finding ALJ's failure to consider VA determination harmless where the ALJ considered the opinions of VA doctors); Orsborn v. Astrue, No. CV 12-13, 2012 U.S. Dist. LEXIS 171587, at * 4 (D. Mont. Dec. 3, 2012) ("By considering the evidence underlying the rating, the ALJ adequately considered and rejected the rating, even though he did not mention the specific figure."). Therefore, although the ALJ should have discussed the VA disability rating decision, I cannot conclude that this alone requires remand.[20]

### III. CONCLUSION

THEREFORE, IT IS ORDERED that the ALJ's decision is **AFFIRMED**, and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 29th day of May, 2015.

/s Lynn Adelman
LYNN ADELMAN
District Court Judge

---

[20]In his main brief, plaintiff pointed to nothing specific in the VA notice, aside from the percentage, that the ALJ should have considered (Tr. at 1137-38), and he filed no reply in response to the Commissioner's argument that this error was harmless. See, e.g., Baca v. Colvin, No. 13-1126, 2014 U.S. Dist. LEXIS 100094, at *15-20 (D. Kan. July 23, 2014); see also Williams v. Dieball, 724 F.3d 957, 962 (7th Cir. 2013).